**AFFIRM; and Opinion Filed December 19, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-14-01242-CV
No. 05-14-01314-CV

## THE STATE OF TEXAS
## FOR THE BEST INTEREST AND PROTECTION OF T.T.

**On Appeal from the Probate Court No. 3**
**Dallas County, Texas**
**Trial Court Cause Nos. M.I.-14-70647 and MED-14-80400**

## MEMORANDUM OPINION

Before Justices Bridges, Lang-Miers, and Myers
Opinion by Justice Lang-Miers

T.T. appeals from a judgment of commitment for temporary inpatient mental health services (No. 05-14-01242-CV) and an order to administer psychoactive medications (No. 05-14-01314-CV). In the involuntary commitment case, T.T. asserts that the evidence is legally insufficient to support the trial court's findings that as a result of mental illness: (1) T.T. was likely to cause serious harm to himself; (2) T.T. was likely to cause serious harm to others; and (3) T.T. is deteriorating in his ability to function independently. In the medication case, T.T. contends that the evidence is legally insufficient to show that the criteria were established for the administration of psychoactive medications. For the following reasons, we resolve T.T.'s issues against him and affirm the trial court's judgment of involuntary commitment and order to administer psychoactive medications.

## BACKGROUND

On August 31, 2014, a Dallas police officer responded to a disturbance at the Greyhound bus station where it was reported that T.T. had threatened to have the security officer at Greyhound killed. The police officer reported that T.T. claimed to work with the Defense Department and the Central Intelligence Agency, has "top clearance," and was a "chief magistrate." The police officer stated that based on what he was told or observed, T.T. evidenced "a substantial risk of serious harm to himself . . . or others[.]" The police transported T.T. to Green Oaks Hospital for admission for inpatient mental health services on an emergency basis.

The State of Texas filed an application for temporary court-ordered mental health services on the grounds that T.T. is mentally ill and as a result of the mental illness is likely to cause serious harm to himself or others, or is deteriorating in his ability to function independently. On September 1, 2014, the court ordered T.T. into the protective custody of the Department of Veterans Affairs Medical Center pending a hearing on the State's application, and T.T. was transferred from Green Oaks to the VA Medical Center.

At the hearing on the State's application for involuntary commitment, the court heard the expert medical testimony of Dr. Monte L. Goen of the VA Medical Center and considered the Physician's Certificates of Medical Examination for Mental Illness of Dr. Goen and Dr. Roger Butler, a psychiatrist at Green Oaks Hospital. T.T. also testified. At the conclusion of the hearing, the court granted the state's application and ordered T.T. involuntarily committed. The court signed a judgment in which it found that T.T. is mentally ill and that as a result of the mental illness was likely to cause serious harm to himself or others, was deteriorating in his ability to function independently, and was unable to make a rational and informed decision about

whether to submit to treatment. The court also ordered the administration of psychoactive medications.

In issues one, two, and three, T.T. argues, respectively, that the evidence is legally insufficient to support the court's findings that T.T. is a danger to himself, to others, and is deteriorating in his ability to function independently. In issue four, T.T. argues that the evidence is legally insufficient to support the court's finding that the criteria were established for the administration of psychoactive medications.

## STANDARD OF REVIEW

The standard of review is the same for both a commitment judgment and an order to administer psychoactive medications. *State ex rel. D.W.*, 359 S.W.3d 383, 385 (Tex. App.—Dallas 2012, no pet.). We apply a heightened standard of review in determining whether the State satisfied its burden. *Id.* The trial court must find that the statutory criteria were established by clear and convincing evidence. *Id.* Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979) (per curiam). In our review, we examine all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *D.W.*, 359 S.W.3d at 385.

## ORDER OF INVOLUNTARY COMMITMENT

A court may order a proposed patient to receive temporary inpatient mental health services if the court finds by clear and convincing evidence that the proposed patient is mentally ill and that as a result of the mental illness, the proposed patient:

(A) is likely to cause serious harm to himself;

(B) is likely to cause serious harm to others; or

–3–

(C) is:

(i) suffering severe and abnormal mental, emotional, or physical distress;

(ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

(iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

TEX. HEALTH & SAFETY CODE ANN. § 574.034(a) (West Supp. 2014). To constitute clear and convincing evidence, expert testimony is required and there must be evidence of a recent overt act or a continuing pattern of behavior that tends to confirm:

(1) the likelihood of serious harm to the proposed patient or others; or

(2) the proposed patient's distress and the deterioration of the proposed patient's ability to function.

*Id*. § 574.034(d).

Evidence of a recent overt act or continuing pattern of behavior must relate to the criteria on which the judgment was based. *State ex rel. N.H.*, No. 05-14-00660-CV, 2014 WL 4724708, at *2 (Tex. App.—Dallas Sept. 24, 2014, no pet.) (mem. op.). And the expert's opinions and recommendations must be supported by a showing of the factual bases on which they are grounded. *State ex rel. T.M.*, 362 S.W.3d 850, 852 (Tex. App.—Dallas 2012, no pet.).

Here, the court found that the commitment was justified under all three criteria listed in section 574.034(a). T.T. contends that the evidence is legally insufficient to support those findings.

At the commitment hearing, the court considered Dr. Goen's and Dr. Butler's written evaluations of T.T. Dr. Butler diagnosed T.T. with "psychosis NOS" and Dr. Goen diagnosed T.T. with paranoid schizophrenia and hypertension. Both agreed that due to T.T.'s delusions and psychosis, he is unable to provide for his basic needs, care for his medical conditions, or make

–4–

decisions about whether to submit to treatment. Dr. Goen also reported that T.T. "threatens to harm people even with threats of death," claims to have authority "to order the executions of anyone in my way[,]" and claims to be the adopted son of President and Nancy Reagan. Dr. Goen also reported that T.T. does not sleep and takes "showers, paces & disrupts unit every day[.]" Dr. Goen asked the court for an order to administer psychoactive medications, stating that T.T. has a long history of untreated mental illness, has "zero insight," and that "supportive therapy" has not worked.

Dr. Butler reported that while T.T. was in Green Oaks, he was "talking to his armband/watch and saying 'take them out now.'" He also stated that T.T. claimed to be "the 45th president of the United States, T– R– T– Reagan," was "about to get flying privileges and . . . am going to Washington D.C. to meet with the Pentagon," and claimed to be "the one who will bring peace to the Palestinian-Israeli conflict."

In addition to his written evaluation, Dr. Goen testified at the commitment hearing. He gave a history of T.T.'s hospitalizations and stated that T.T. claimed to have sustained a spinal cord injury, claimed to be a quadriplegic, couldn't talk, and was blind. But he said T.T. refused all medical scans and "showed zero evidence of being paralyzed of all four limbs, [and] zero evidence of being blind." Dr. Goen said all efforts to treat T.T. as an outpatient have been unsuccessful, and he has had "zero follow-up" at the VA Medical Center because T.T. refuses treatment. He also said T.T. has no family to care for him because of his refusal to get treatment for his mental illness. Dr. Goen testified that treatment in a structured psychiatric hospital is the least restrictive approach that will benefit T.T. at this point. But when Dr. Goen has talked to T.T. about that, T.T. has "threaten[ed] to have [Dr. Goen] handcuffed, . . . threaten[ed] [him] with a Supreme Court injunction, . . . [and] possible execution."

Dr. Goen testified that T.T. believes he is a CIA agent, a secret service agent, and the 45th president of the United States. He said T.T. "has a need to go to Washington to speak with President Obama about anti-terrorism issues. And if he doesn't get his way, he believes he has the authority not just to go meet with him but to execute him." Dr. Goen said T.T. "is seen as very, very dangerous to others." He said T.T. "has also come to the attention of the United States treasury department secret service and is viewed as a significant threat to the President of the United States." Dr. Goen said reports from the Pentagon indicated that T.T. was planning to purchase weapons and take a bus to Washington D.C. Dr. Goen said T.T. "confirm[ed] that he ordered [the Greyhound agent] to be executed." He said T.T. is "viewed as a serious threat to national security and possibly the President." He also said the "Secret Service reported last year [T.T.] got in the White House in a wheelchair, claiming to be a federal police officer to try to see President Obama [and] is viewed as a serious threat among our nation's highest security levels."

Dr. Goen testified that T.T.'s blood pressure, uncontrolled, is "above 200 over 110." He said the only time T.T.'s blood pressure is normal is after T.T. has had an "emergency injection with psychotropic medications." Dr. Goen testified that T.T. is "at risk for all the complications of hypertension[.]" And he testified that T.T. is unable to make rational and informed decisions about his treatment and is deteriorating in his ability to function independently. He testified that if T.T. is released, "[h]e is going to have the secret service following him, possibly indefinitely . . . [and] right now he is broke – he's been on the streets for a while already . . . possibly try to buy some undisclosed weapons, and he will probably get arrested or worse [t]oday, tomorrow, or shortly in the near future, because he is viewed as a serious threat to national security and possibly the President."

T.T. also testified at the commitment hearing. He said he grew up in Fort Worth and served in the Army for almost four years. He said he was injured while serving in Beirut, "such

as a spinal cord injury as well as being legally blind." He said he received an honorable discharge with a "medical pending." He said he currently receives a 100% medical disability from the VA.

T.T. testified that he does not have a mental illness, that he has been a model patient at the VA Medical Center and is not disruptive, and "it's just a big misunderstanding at this point." T.T. stated that he receives disability income due to post-traumatic stress disorder, but that the medical condition does not affect him. When the State asked T.T. whether he had threatened any of the medical staff at the VA Medical Center, T.T. said, "What you deem as a threat is not really a threat." He said he told the staff they did not have a right to medicate him. T.T. took issue with much of Dr. Goen's testimony, stating, "I don't know where he got his facts from, but Judge, it shouldn't be a problem for you to contact the Fort Worth bus terminal and they can prove that I did purchase a roundtrip bus ticket, sir."

When T.T. was asked why he was at a hospital earlier in the year, he replied "because there was a brief moment that maybe somebody thought that they were – I was out in the community and they felt that they needed to contact those particular people that they know. Next thing I know I had to go to John Peter Smith for three days. I finally got out, and when I got out I went back towards my normal life. . . ." He said he was not homeless and had just rented an apartment a few months earlier. He said he was "here just enjoying this particular area as well as planning on getting my particular personal space age flight. Judge, I was going to catch a space age flight and go to D.C. area that's what I thought I would do, because I do have that particular privilege."

T.T. denied threatening the President of the United States. When the court asked T.T. how he would threaten the President if he was going to, T.T. replied, "Well, sir, due to all

common sense, you do not threaten the President of the United States." When pressed for an answer, T.T. said "if I would disagree with him I would contact my senator or my congressman."

T.T. explained that the weapons referred to in earlier testimony "was to keep here. I was going to visit Washington, but just to visit the historical sites; the museum as well as all the other historical buildings and sites in the D.C. area." He said he had a ticket for the Greyhound bus from Fort Worth to Dallas and back. He said he had a "run-in with security" at the bus station, but explained that "security made a serious error." When asked whether he told anyone he was the 45th president of the United States, T.T. said, "Well in the fake terms it was kind of like, it's was [sic] a misunderstanding. Since they say they know me and I know they was kind of afraid of me, I was actually playing with him."

T.T. said if the trial court released him, he might go back to his apartment and referred to it as a "navy gateway." He said the security there apologized to him and said they made a mistake because "they were not aware that [his] security status was still valid."

Based on the entire record, we conclude that a reasonable factfinder could form a firm belief or conviction that T.T. is mentally ill and that as a result of the mental illness, as confirmed by his recent threats and continuing pattern of behavior, there is likelihood of serious harm to himself or others and T.T. is deteriorating in his ability to function independently. Accordingly, we conclude that the evidence is legally sufficient to support the trial court's judgment of involuntary commitment and resolve issues one, two, and three against T.T.

### ORDER TO ADMINISTER PSYCHOACTIVE MEDICATIONS

A court may order the administration of one or more classes of psychoactive medications to a patient who is under a court order to receive inpatient mental health services. TEX. HEALTH & SAFETY CODE ANN. § 574.106(a)(1) (West 2010). The court may issue an order if it finds by clear and convincing evidence that the patient lacks the capacity to make a decision regarding the

–8–

administration of the proposed medications, and treatment with the proposed medications is in the best interest of the patient. *Id.* In making its determination that treatment with the proposed medications is in the best interest of the patient, the trial court must consider

> (1) the patient's expressed preferences regarding treatment with psychoactive medication;
>
> (2) the patient's religious beliefs;
>
> (3) the risks and benefits, from the perspective of the patient, of taking psychoactive medication;
>
> (4) the consequences to the patient if the psychoactive medication is not administered;
>
> (5) the prognosis for the patient if the patient is treated with psychoactive medication;
>
> (6) alternative, less intrusive treatments that are likely to produce the same results as treatment with psychoactive medication; and
>
> (7) less intrusive treatments likely to secure the patient's agreement to take the psychoactive medication.

*Id.* § 574.106(b).

At the medication hearing, Dr. Goen asked for an order to administer four types of psychoactive medications: antidepressants, antipsychotics, sedatives, and mood stabilizers. Dr. Goen explained that he would "hold [antidepressants] in reserve" and administer only if T.T. "continues to have severe insomnia . . . or possibly becomes depressed[.]" With regard to antipsychotics, Dr. Goen testified that T.T. has never been diagnosed with PTSD, there is no indication T.T. has ever been paralyzed, and T.T. "has a present record of disruptive and assaultive behavior[.]" Dr. Goen said T.T. had received seven rounds of emergency injections of antipsychotics and "there has been a significant improvement, improved sleep, improved reality testing." Dr. Goen also testified that T.T. needs a mood stabilizer because of his "grandiose delusions" including that he is the Reagans' adopted son, a naval criminal investigations security agent, a secret service agent, a federal police officer with authority to order others with

disabilities executed, and the 45th president of the United States. The doctor said a mood stabilizer would help control T.T.'s "explosive behaviors . . . some of his grandiose delusions and . . . shorten his hospital stay." Dr. Goen also testified that T.T. could benefit from sedatives because T.T. "gets extremely agitated, disruptive, and threatens to put me in handcuffs or worse." Dr. Goen testified that sedatives will help calm T.T. down, improve his sleep, and shorten his hospital stay.

In addition to the benefits of each type of medication, Dr. Goen testified about the side effects of each, but said the benefits of all the requested medications outweigh any risks to T.T. He also said the medical staff would monitor T.T. very closely and adjust the medications as necessary. Dr. Goen testified that T.T.'s prognosis without the medications is "[h]orrible." But with the medications, T.T. could have improved sleep and reality testing, hopefully improved insight and improvement in his medical conditions, and his long-term outlook was "good."

Dr. Goen said there was no viable alternative to inpatient administration of the medications because of T.T.'s refusal to submit to treatment on an outpatient basis. Dr. Goen testified that T.T. is unable to make a decision about the administration of medications because "he has zero insight about his mental illness and that severely impacts his ability to understand treatment options." He said T.T. "is very intelligent" and in his experience, "the more intelligent a person is, especially with schizophrenia, the worse their insight is."

T.T. did not testify through question and answer at the medication hearing, but asked his attorney to advise the trial court that he was opposed to taking medications because he is Jewish. T.T. also made a statement to the court that his purchase of a bus ticket, spinal cord injury, and blindness were all matters of record that the court could verify.

Having reviewed the entire record and the factors the trial court must consider in making its decision, we conclude that the court could have formed a firm belief or conviction that T.T.

lacked the capacity to make a decision about the administration of the proposed medications, and treatment with the proposed medications was in T.T.'s best interest. We conclude that the evidence is legally sufficient to support the court's findings and resolve issue four against T.T.

## CONCLUSION

We affirm the trial court's judgment of involuntary commitment and order to administer psychoactive medications.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

141242F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

THE STATE OF TEXAS FOR THE BEST
INTEREST AND PROTECTION OF T.T.

No. 05-14-01242-CV

On Appeal from the Probate Court No. 3,
Dallas County, Texas
Trial Court Cause No. M.I.-14-70647.
Opinion delivered by Justice Lang-Miers,
Justices Bridges and Myers participating.


In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.


Judgment entered this 19th day of December, 2014.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

THE STATE OF TEXAS FOR THE BEST INTEREST AND PROTECTION OF T.T.

No. 05-14-01314-CV

On Appeal from the Probate Court No. 3, Dallas County, Texas
Trial Court Cause No. MED-14-80400.
Opinion delivered by Justice Lang-Miers, Justices Bridges and Myers participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 19th day of December, 2014.